FILED

MAY 16 2005

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-10005 |
| Plaintiff, | |
| -vs- | ORDER AND OPINION ADOPTING REPORT AND RECOMMENDATION |
| CLAUDETTE RAIGH WALKING ELK, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

Defendant filed a motion (Doc. 21) to suppress the claimed statement she made to FBI Special Agent Daniel Orr ("Orr") on October 7, 2004, on the grounds that 1) she was not advised of her rights under Miranda v. Arizona, 384 U.S. 436 (1966), and United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), and 2) the statement was taken in violation of her Sixth Amendment right to counsel. The motion came on for hearing before the Honorable Myles J. Devine on April 7, 2005, with the government appearing by Assistant U.S. Attorney Mikal Hanson and the defendant appearing in person and with her attorney, Terry L. Pechota. At the hearing, testimony was also presented as to the voluntariness of another statement taken by Orr from the defendant on October 26, 2004. Magistrate Devine issued his report and recommendation on the record and issued a formal report and recommendation (Doc. 43) based upon his oral findings on April 7, 2005. The magistrate recommended that the motion to suppress as to both statements be denied. The defendant filed objections (Doc. 46). The Court has conducted a *de novo* review of the record, including the transcript (Doc. 49) of the motions hearing.

Any references to the transcript will be "T" followed by the page number or numbers.

## BACKGROUND

Defendant is charged with having assaulted a seventeen year old girl with a dangerous weapon, shod feet, in violation of 18 U.S.C. § 113(a)(3). The assault allegedly took place on

May 19, 2004. Defendant was charged with aggravated assault and simple assault in Standing Rock Sioux Tribal Court on May 20, 2004. Defendant was represented in tribal court by Tribal Advocate Faith Taken Alive, a lay person admitted to practice in tribal court but not admitted to practice law in state or federal court. After several continuances, defendant was convicted after a bench trial on October 28, 2004, of simple assault. She was sentenced to ten days custody in tribal jail, with all ten days suspended due to pregnancy upon the condition that she abide by conditions of probation for one year. She was also fined $150 and ordered to pay $20 court costs.

The investigation of the tribal charges was conducted by BIA law enforcement agent David Lawrence ("Lawrence"). Lawrence advised the defendant that she was charged in tribal court and a warrant had issued for her arrest. Lawrence called defendant several times at work in an effort to interview her about the alleged assault, each time leaving a message. She returned calls to Lawrence and they played "phone tag" until they finally spoke on the telephone during June. Defendant was afraid at one time (before she was terminated from her employment) that she would be arrested at her work place, tribal headquarters in Ft. Yates, North Dakota, and that she would be publicly humiliated by being handcuffed and led away in front of her co-workers. That had apparently happened to at least one other tribal employee facing charges in tribal court. In an effort to delay an arrest, defendant agreed to meet with Lawrence to be interviewed. Several subsequent contacts were made in an effort to set up an interview but each time the defendant was unable or unwilling to leave her job.

On October 7, 2004, Orr went to the defendant's residence in Kennel, South Dakota, to speak with her regarding the FBI's investigation of the assault. Orr was accompanied by FBI Special Agent Gerald White. They both drove Ford Expeditions, vehicles recognized as law enforcement vehicles on the reservation. Despite two vehicles being in the yard at the defendant's residence, Orr could not get an answer at the defendant's door. He and White left in their separate vehicles and went to Ft. Yates to conduct other business.

Defendant testified that she was in the shower when the agents visited. Shortly thereafter a neighbor called to advise defendant that Lawrence (who apparently also drives a Ford Expedition) was at her house. The defendant drove towards the police station to see what

Lawrence wanted. On the way she passed by Orr's vehicle coming back to Kennel from Ft. Yates on highway 1806. She thought it was Lawrence's vehicle and applied her brakes. Orr, seeing defendant's vehicle brake, pulled over on a turn off. Defendant turned around and pulled her vehicle near Orr's. She approached the vehicle, opened the passenger door, and expressed surprise to find Orr instead of Lawrence.

Orr identified himself as an FBI special agent, inquired as to her identity to be sure he was talking to Claudette Walking Elk and told her he wanted to talk to her about Amanda (the victim of the May 19, 2004, alleged assault). At this point, the defendant and Orr give different versions. Orr testified that defendant said she was not sure she wanted to talk to him. Orr inquired what her concerns were and she told him her friends told her not to talk to anyone about the assault. Orr testified that he asked her if she wanted an attorney present and she said she was not sure. Orr testified that he told her she did not have to talk to him but she proceeded to tell Orr about the history she had with Amanda. Orr asked the defendant if they could go somewhere to sit and talk. Defendant would not agree to this. Defendant testified that she told Orr that Faith Taken Alive was representing her and that Taken Alive told her not to talk to anyone. Whatever the case, defendant gave Orr her telephone number and told him to call her at 10:00 p.m. that evening about possibly setting up an interview.

Orr called defendant as planned at 10:00 p.m. on October 7, 2004. Defendant could not meet the following day but asked Orr to call her back again about an interview. Several more telephone contacts occurred before an interview date of October 26, 2004, was finally selected. Defendant chose the place for the interview, the Kennel Community Center. Defendant did not want to meet at her home because her children would be present. Defendant lives a few blocks from the Kennel Community Center. Defendant had obtained the key to the Community Center and unlocked the door for Orr. The door locked behind them so that no one could enter from the outside. However, the door was not locked from the inside.

The interview on October 26, 2004, lasted approximately one and one-half to two hours. Orr testified that he reassured defendant several times that she would not be arrested following the interview, that he never raised his voice, never accused defendant of being untruthful, made no threats or promises to her (other than the fact that she would not be arrested at the end of the

interview), and that the issue of an attorney never came up at that interview. Orr asked defendant if she wanted to make a recorded statement and she declined to do so, stating that she would make her own recorded statement at a later time. Defendant did not challenge Orr's testimony as to the demeanor of the interview.

Defendant testified that Orr did not tell her any of her rights at the October 26, 2004, interview. She testified that she felt she had to give a statement or she would be arrested (and humiliated) by being arrested at work at some other time. Interestingly, defendant testified that she had been suspended from her position at the tribal office on September 15, 2004. Her claim that she feared later arrest at the tribal office is therefore not credible and casts doubt on her total credibility. Defendant testified that Orr told her that he needed to get an interview with her or he would have to get a warrant and she would have to talk to him. This claim is ridiculous and is not credible. She already knew that no one could force her to make any statement. Her own advocate had told her as much. Orr had also told her that several times. She did testify, however, that she knew she was not going to be arrested on October 26, 2004.

Defendant is 36 years old. After serving in the army, she completed almost three years of college, studying business administration. She has held various responsible positions for the tribe, working as a detention center guard, as the home improvement director, as an EPA clerk, and as the administrative secretary for the Tribal Chairman. She was also the Veteran Service officer for her tribe. She had prior experience in tribal court on an assault charge which went to trial and was appealed. Faith Taken Alive was her tribal advocate in conjunction with the prior assault charge as well. The defendant is not some uninformed poorly educated person. She admitted she knew of her Miranda rights before October of 2004.

Defendant testified that she was specifically advised by Taken Alive in conjunction with the current tribal assault charges that she should not talk to anyone. She steadfastly claims that Orr knew who her "attorney" was on October 7, 2004, and knew on October 26, 2004, that she was going to tribal court on October 28, 2004 (although she was not sure whether Orr knew that before the interview or after). Defendant testified that Orr told her at the conclusion of the October 26, 2004, interview that he would put in a good word for her with the prosecutor and that if she did not hear anything by December she should not worry. The indictment issued in

February, 2005, apparently much to the surprise of the defendant. Orr confirmed that he told defendant that she had been cooperative and that he would let the prosecutor know that. He denied however that he told her not to worry about federal charges if they were not filed by December, adding that he would never make such a statement to anyone. Any law enforcement officer, including Orr, would know that he would have no control as to when the grand jury would meet or what the grand jury would do. The testimony of the defendant to the contrary is not credible.

## I. Fifth Amendment.

### A. Miranda.

The Fifth Amendment to the United States Constitution affords criminal suspects the rights to be free from compulsory self-incrimination. Criminal suspects must have knowledge of their Fifth Amendment rights "before they can either intelligently exercise or waive these important privileges." United States v. Griffin, 922 F.2d 1343, 1356 (8th Cir. 1990). The United States Supreme Court held in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that any time a person is taken into custody for questioning they must be advised of their Fifth Amendment rights in order "to counteract the 'inherently compelling pressures' of custodial interrogation." Arizona v. Roberson, 486 U.S. 675, 681, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988). Miranda "requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." Griffin, 922 F.2d at 1347. There is no dispute here that Orr did not issue the standard Miranda warnings before either the October 7 or October 26 meetings.

"Interrogation" is "the direct questioning [by a law enforcement officer] or any practice reasonably likely to evoke an incriminating response from a suspect." Griffin, 922 F.2d at 1347 (*quoting* Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980)). What occurred on October 7, 2004, between Orr and the defendant cannot be considered "interrogation." Orr identified himself to the defendant at that time, confirmed her identity, and told her he would like to speak to her about the assault on Amanda. Defendant does not contend that Orr asked any questions of her other than in an attempt to set up a future

interview. Any statements made by her were gratuitous on her part. Miranda was not at all implicated during that encounter. The interview on October 26, 2004, was, without question, an interrogation within the meaning of Miranda.

"Custody" for the purposes of a Miranda analysis "occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of [her] freedom of action in *any* significant way." Griffin, 922 F.2d at 1347.

The Court must go on to consider whether a reasonable person in defendant's position would have believed that her freedom of movement was limited by law enforcement officers to a degree associated with formal arrest. United States v. Bordeaux, 400 F.3d 548, 559-60 (8th Cir. 2005). The relevant inquiry is how a reasonable person would have understood her situation. United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004). "In making that evaluation, we consider the totality of the circumstances that confronted the defendant at the time of questioning." *Id.*

The Eighth Circuit has held that "the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation." Griffin, 922 F.2d at 1348. Orr's encounter with the defendant on October 7, 2004, was not a custodial situation when viewed in light of those factors. The defendant was standing outside Orr's vehicle on the passenger side while the agent was seated in the vehicle. There is no question that the defendant was free to get in her car and leave at any time. The encounter occurred off the highway for at most 20 minutes and the overriding purpose, according to both the defendant and Orr, was to attempt to set up a future interview.

As to October 26, 2004, the defendant herself chose the location of that interview, a neutral place close to her home. She was questioned on her own "turf," a very relevant factor. Czichray, 378 F.3d at 826. She arranged the time of the interview. She had control over the keys to the place of the interview. The door was not locked to prevent her from leaving. The duration was not overly-long, lasting at most two hours. Defendant herself testified that she knew she would not be arrested immediately following that interview. She was clearly not in custody on October 26, 2004, when she was interviewed by Orr. Therefore, there was no requirement that

6

Orr advise defendant of her Miranda rights to remain silent and to have an attorney present prior to taking statements from her.

The Eighth Circuit set forth in Griffin several common "indicia of custody" considerations relating to "police practices employed during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation." Griffin, 922 f.2d at 1349. Those factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349.

The Griffin indicia factors, while instructive, are not dispositive. Bordeaux, 400 F.3d at 560. They are merely one means of analyzing whether the defendant had a reasonable subjective belief that her "freedom of action [was] curtailed to a degree associated with formal arrest" and "whether that belief [was] objectively reasonable under the circumstances." Griffin, 922 F.2d at 1349. The Eighth Circuit held in Griffin that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." Griffin, 922 F.2d at 1349. The FBI routinely informs suspects of their "Griffin rights" as a matter of course. Orr testified that, at the time of both of his personal contacts with the defendant, he told her, several times, that she did not have to talk to him and he made it clear that he was not going to arrest her - that she could go home after they talked. Defendant denies that she was ever given notice of those rights. The magistrate found that Orr's testimony was credible, a conclusion to which the defendant objects. I am entitled to "give weight to the magistrate judge's credibility determination." United States v. Martinez-Amaya, 67 F.3d 678, 681 (8th Cir. 1995). I have, however, conducted a *de novo* review of the record and have made the same credibility finding. Czichray held that repeatedly giving the Griffin advice of rights

amounts to a "weighty inference that [defendant] was not in custody." Czichray 378 F.3d at 826. No Miranda violation occurred here.

It is disturbing that Orr did not know whether or not it is FBI policy to give Griffin rights to people being interviewed while not in custody (T-24). He had, however, at least some understanding of the Griffin rights. See T-24 and 25. There is nothing in the record to show that Orr ever advised the defendant that she could terminate the interview at any time. He should have done that. He should have been more careful in each encounter with the defendant.

The court, however, must be mindful of recent Eighth Circuit law.

> Although the 'non-exhaustive' *Griffin* factors and their attendant balancing test are often cited in our decisions concerning *Miranda*, we recently resolved the question of 'custody' as an *en banc* court with nary a mention of *Griffin*. See United States v. LeBrun, 363 F.3d 715, 719-24 (8th Cir. 2004) (*en banc*). There is no requirement, therefore, that the *Griffin* analysis be followed ritualistically in every *Miranda* case. When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly . . . And the court must consider whether the historical facts, as opposed to the one-step removed *Griffin* factors, establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to 'aggravate the existence of custody' cannot create the functional equivalent of formal arrest where the most important circumstances show its absence.

Czichray, 378 F.3d at 827-28. The present case does not come within a mile of what happened to Dr. Czichray.

Taking into account the totality of the circumstances, a reasonable person in the defendant's position would not have understood that she was in custody at any time. Orr was not, under the circumstances present, required to warn the defendant of her Fifth Amendment privilege against self-incrimination and the right to the assistance of counsel as required by Miranda prior to talking with the defendant on October 7 or 26 of 2004.

**B. Voluntariness.**

The Fifth Amendment prohibits authorities from "compelling" a person to give an incriminating statement. Therefore, "[v]oluntariness remains the standard for admissibility" of defendant's statements. United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989). The

Eighth Circuit has described this voluntariness inquiry as the "overborne will" doctrine. Jorgensen, 871 F.2d at 729. *See also* LeBrun, 363 F.3d at 725 ("our polestar always must be to determine whether or not the authorities overbore the defendant's will"); Bordeaux, 400 F.3d at 560 ("A statement is involuntary if it was extracted by use of physical and or psychological pressure that overbore a defendant's will."). A statement is not involuntary "unless it is established that law enforcement officials engaged in coercive activity." Bordeaux 400 F.3d at 560.

The only testimony elicited from the defendant which touched upon the voluntariness of her statements was her concern that she would be arrested if she did not give a statement. However, the defendant was supposedly concerned about an arrest at some later date, not on the dates she was interviewed. A statement is not involuntary even if defendant feared imminent arrest. Wilson v. Lawrence County, 260 F.3d 946, 953 (8th Cir. 2001) (*citing* Jorgensen, 871 F.2d at 730). *See also* United States v. Adams, 346 F.3d 1165, 1171-72 (8th Cir. 2003) (fact that interviewee was afraid of being arrested is not *per se* coercive in the context of consenting to a search warrant). Further, her claim that she was concerned about the embarrassment of being led out from the tribal offices in handcuffs has no credibility (as previously discussed) since she was suspended from her job in September, well before Orr had any contact with her.

There are other reasons to find that defendant's statements were voluntary. Defendant told Orr during her first encounter with him that she needed time to talk with friends and others about whether she should give any statement. We do not know whether she followed through with her own thoughts and actually sought out further advice from her tribal advocate or from others. All she had to do in any event was to do what she had been told previously by her advocate, namely not give any statements to anyone. This is not a case where the defendant was "pounced upon" by the FBI demanding an immediate interview. She was given a great deal of time to think about what she wanted to do and what she did not want to do.

Defendant testified that she stopped and turned her car around because she knew that law enforcement officials were looking for her. She "wanted to take care of whatever they were looking for me for." (T41). She talked to Orr at the community center because she had small

9

children in her home and her home would not have been an appropriate place to conduct the interview (T43).

All of these items are further strong indications of voluntariness.

## II. Sixth Amendment Right To Counsel.

Defendant contends that her statements were taken in violation of her Sixth Amendment right to counsel because she was, at the time of both interviews, represented by a Standing Rock Sioux Tribal Court advocate. Defendant claims that she indicated prior to the October 7 "interrogation" that she wanted an attorney. Again, she did not address at all the October 26, 2004, statement in her written motion but evidence was taken as to the circumstances of that statement and the defendant argued the admissibility of that statement in her objections. She has gone beyond her filed motion but this will be permitted.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The United States Supreme Court held in Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964), that the Sixth Amendment requires the suppression of any confession "which federal agents had deliberately elicited from [defendant] after [s]he had been indicted and in the absence of [her] counsel." Massiah, 377 U.S. at 206, 84 S.Ct. at 1202. In relying on Massiah, the United States Supreme Court has held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of [her] right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." Michigan v. Jackson, 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986).

> Indeed, after a formal accusation has been made – and a person who has previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment – the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.

Michigan v. Jackson, 475 U.S. at 632, 106 S.Ct. at 1409.

Under the teaching of Massiah and Jackson, there is no doubt that the Sixth Amendment right to counsel attaches when a defendant is arraigned in federal or state court. The question

presented in this case is whether it also attached under the circumstances here present when defendant had been charged in tribal court arising out of the same incident, was represented in tribal court by a lay advocate, and had not been charged in federal court.

    The plain language of the Sixth Amendment prohibits the government from infringing upon an *accused's* right to counsel in all *criminal* prosecutions. The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed. 2d 424 (1977) (*quoting* Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)). Simply stated, the Sixth Amendment right to counsel does not attach until after formal adversary criminal judicial proceedings have been initiated.

    "There is no Sixth Amendment right to counsel in Indian Country as to tribal court matters although such right is guaranteed by the Indian Civil Rights Act ("ICRA") (but only at the expense of the defendant)." United States v. Swift Hawk, 2000 DSD 52 ¶ 6, 125 F.Supp.2d 384, 387. *Accord* United States v. Red Bird, 287 F.3d 709, 713 (8th Cir. 2002). The Eighth Circuit in Red Bird held that the Sixth Amendment is implicated when an Indian is charged in the Rosebud Sioux Tribal Court because the Rosebud Sioux Tribal Constitution "guarantees the right to be represented by an attorney and the tribe provides indigent defendants with a licensed attorney from the tribal public defender's office." *Id.* at 713. Obviously, the defendant here was not represented by an attorney. The Standing Rock Sioux Tribe has no such Constitutional provision. Because the Sixth Amendment is not implicated in Standing Rock Sioux Tribal Court matters in the manner that it is in Rosebud, the Sixth Amendment right to counsel does not attach merely because the defendant was charged in tribal court prior to being questioned by Orr.

    In any event, the Sixth Amendment exclusionary rule would not attach unless there was evidence that (1) the defendant had been formally charged, by complaint or otherwise, prior to her interview, (2) she was represented by "counsel" at the time of the interview and Orr knew this or at least should have known this, and (3) Orr was working in tandem with tribal officials in the investigation and charging of the defendant. United States v. Eastman, 2003 D.S.D. 5 ¶ 11, 256 F.Supp.2d 1012, 1016-17. There is no evidence in the record that defendant was represented

by "counsel" at the times Orr talked with her. Unlike the situation in Red Bird, defendant was "represented" by a lay advocate who was not an attorney, in tribal court or elsewhere. Finally, there is no evidence in the record that Orr was working in tandem with tribal officials. There was testimony that Lawrence was working with Orr to contact the defendant to set up an interview for Orr. However, Orr and Lawrence conducted their own separate investigations. Lawrence took statements from the defendant in June, 2004. There is no evidence that any federal officers were present at that time. Neither Lawrence nor any other tribal official was present during either of the two personal contacts Orr had with the defendant. Working within the foregoing framework, the defendant's Sixth Amendment right to counsel had not attached prior to the interview conducted by Orr.

There are yet other reasons why defendant's motion must be denied. The Sixth Amendment right to counsel is offense specific. McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). The question then is whether the tribal and federal charges in effect charge the same thing. Texas v. Cobb, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) teaches us that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. at 173, 121 S.Ct. at 1343 (quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 176 L.Ed. 306 (1932)). The tribal charges initially were simple assault and aggravated assault. The tribal criminal complaint alleged that the defendant assaulted a juvenile by throwing her to the ground, hitting and kicking her about the face, breaking her nose, giving her two black eyes and other injuries, and that the age of the juvenile was 17. All of these elements would have nothing to do by way of proof as to the later federal indictment. Certainly, to prove aggravated assault in tribal court, injuries suffered by the alleged juvenile victim would be elements of the charge to be proved. The federal charge is assault with a dangerous weapon with the intent to do bodily harm to the alleged victim. There is no federal proof requirement to show that the alleged victim was actually injured or what her age was. The federal government would be required to prove that a dangerous weapon was used with the requisite intent. The defendant was convicted in tribal court, after a bench trial, of simple assault and was found not guilty of aggravated

assault. Simple assault under the common law has nothing to do with a weapon. The question of a conviction, however, does not govern. Rather, it is a comparison of the different charges. No one placed in evidence before the magistrate what is contained in sections 4-518 or 4-517 of the tribal code. I therefore rely on the tribal complaint. I believe it is legally correct to do so based upon Texas v. Cobb. The situation here is totally unlike the situation in United States v. Red Bird, 287 F.3d at 714, where the tribal rape charge had "identical essential elements when compared with the later federal charges filed." The Standing Rock court is also totally unlike the Rosebud tribal court system as explained in Red Bird. The federal and tribal complaints do not charge the same offense for Sixth Amendment purposes. There has been no violation of the Sixth Amendment.

### III. Right to Present Evidence.

Defendant contends that she was denied a fair hearing by the magistrate because he would not allow her to testify about what David Lawrence had told her concerning her need to talk to the FBI or face "being taken away in handcuffs." Any law enforcement officer, including Lawrence, would know that a person cannot be led away in handcuffs because of refusing to speak to the FBI. Defendant knew this as well. Defendant testified that she was afraid that if she failed to give Lawrence a statement she would be humiliated by being arrested and handcuffed at her place of employment, the tribal offices. She also testified that she felt, indeed was told by Orr, that she would be arrested if she did not voluntarily give a statement to Orr. As set forth previously, any such claim concerning giving a statement in October to Orr lacks credibility because she was no longer employed at the tribal offices at that time and therefore would not suffer that humiliation. Her fears surrounding any statement given to Lawrence are wholly irrelevant since Lawrence was not conducting the federal investigation nor working in tandem with federal investigators.

I fully adopt the credibility decisions made by Judge Devine.

Based upon the foregoing,

IT IS ORDERED:

1. The defendant's objections (Doc. 46) to the magistrate's report and recommendation are overruled.

2. The report and recommendation (set forth orally on the record and at Doc. 43) is adopted.

3. The motion (Doc. 21) to suppress is denied.

Dated this 16th day of May, 2005.

BY THE COURT:

*Charles B. Kornmann*
CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: *Barbara J. Paepke*
DEPUTY
(SEAL)